UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------X
                                                  :
ANN ZEAK, as Executor of the Estate of            :
Steven Sullivan,                                  :
                                                  :
                              Plaintiff,          :
                                                  :
             v.                                   :
                                                  :
UNITED STATES OF AMERICA, *et al.*,               :
                                                  :
                              Defendants.         :
                                                  :
---------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: <u>October 20, 2014</u>

11 Civ. 4253 (KPF)

<u>OPINION AND ORDER</u>

KATHERINE POLK FAILLA, District Judge:

On November 10, 2009, Steven Sullivan died during a surgical procedure at the James J. Peters VA Medical Center (the "Bronx VA"), a medical facility located in the Bronx, New York, and operated by the United States Department of Veteran Affairs (the "VA"). Plaintiff, daughter of the deceased, initiated this action on June 22, 2011, alleging medical malpractice, negligent hiring and retention, and failure to obtain informed consent. Plaintiff brings these claims under the Federal Tort Claims Act (the "FTCA"), 28 U.S.C. §§ 1346, 2671-2680, against Defendant United States of America (the "Government"). The Government now moves for summary judgment concerning Plaintiff's claims of medical malpractice and failure to obtain informed consent. Because Plaintiff has failed to identify a genuine issue of material fact concerning these claims, the Government's motion is granted.

# BACKGROUND[1]

## A.    The November 10, 2009 Surgical Procedure

Beginning in 1999, medical tests revealed that Steven Sullivan had developed a chest disease that affected his right lung and caused him to suffer from fevers, increased phlegm production, and an elevated white blood cell count.  (Def. 56.1 ¶ 3).  On February 24, 2009, a computerized tomography ("CT") scan taken at the Bronx VA revealed serious abnormalities with Sullivan's right lung.  (*Id.* at ¶ 5).  Doctors at the Bronx VA recommended surgery, but, at that time, Sullivan declined any surgical intervention.  (Def. 56.1 ¶ 6; Camunas Tr. 26).

On October 28, 2009, Sullivan returned to the Bronx VA, where further tests showed that the condition of his right lung had worsened significantly.  (Def. 56.1 ¶ 7; Cargo Decl., Ex. F at 1 ("The infection in the right lung had progressed between March and November.  In that time, the infection had completely taken over the right lung.  The right lung was no longer

---

[1]    The facts stated herein are drawn from the parties' submissions in connection with the instant motion, including Defendant's Local Rule 56.1 Statement of Undisputed Facts ("Def. 56.1") (Dkt. #39); Plaintiff's responses thereto ("Pl. 56.1 Response") (Dkt. #49); and the exhibits attached to the Declaration of Shane Cargo ("Cargo Decl.") (Dkt. #37). References to individual deposition transcripts will be referred to as "[Name] Tr."  For convenience, Defendant's opening brief will be referred to as "Def. Br."; Plaintiff's opposition brief as "Pl. Opp."; and Defendant's reply brief as "Def. Reply."

Citations to a party's Local Rule 56.1 Statement incorporate by reference the documents cited therein.  Where facts stated in a party's Local Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent ... controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

functional.")).  One of the doctors who examined Sullivan during this hospital visit was Dr. Jorge Camunas, a thoracic surgeon with nearly 30 years of experience.  (Def. 56.1 ¶ 9; Camunas Tr. 27-31).  Having examined Sullivan during prior visits, Dr. Camunas was already familiar with Sullivan's history and condition.  (*See* Camunas Tr. 24-27).  Dr. Camunas recommended a pneumonectomy, a surgical procedure that would entail the complete removal of Sullivan's right lung.  (*Id.* at 31 ("[T]he lung was so destroyed that to be able to control that infection in the long term basis, the lung had to be removed.")).  Although Sullivan had declined surgery in February, after speaking with Dr. Camunas in October about the progression of his disease, he agreed to the pneumonectomy.  (*Id.* ("I saw him at his bedside again and showed him the x-rays …. showing how the process involving his right lung had progressed from the previous time and third time.  Eventually it was the whole right lung.  It was then that he said he wanted to have surgery."); Zeak Tr. 70-72).

On November 9, 2009, Sullivan signed a consent form for the surgery.  (Def. 56.1 ¶¶ 8, 11).  The form was also signed by a resident at the Bronx VA and another witness, the latter of whom attested that he observed the patient and the practitioner sign the form.  (Cargo Decl., Ex. E at 5-6).  The form explained that, while "[u]nder general anesthesia, patient will have right lung removed…."  (*Id.* at 2).  The expected benefits of the surgical procedure listed on the consent form were "removing the infected, poorly functioning lung and to potentially improve ease of breathing and oxygenation."  (*Id.*).  The known risks listed on the consent form were "infection, blood loss, injury to surrounding

organs and structures, [and] potential loss of life." (*Id.*).  The consent form explained that the only alternative to the procedure was "no treatment[,] which could cause further deterioration of ability to breathe, and possible inability to oxygenate generally." (*Id.*).

On November 10, 2009, Dr. Camunas began performing the pneumonectomy with the assistance of an additional thoracic surgeon, Dr. Chun Loh, and a surgical resident, Dr. Catherine Madorin.  (Camunas Tr. 47-49; Loh Tr. 29-31).  Part of the procedure required the surgeons to access Sullivan's pulmonary veins — blood vessels that connect the heart to the lungs. (Def. 56.1 ¶ 14; Cargo Decl., Ex. F at 1; Camunas Tr. 46).  Sullivan's doctors, however, faced difficulty in seeing the pulmonary veins because Sullivan's right lung — which was stiff due to the infection — did not collapse following dissection.  (Def. 56.1 ¶ 14; Cargo Decl., Ex. F at 1; Camunas Tr. 45-46). Although his visibility of the veins was poor, Dr. Camunas was able to feel the inferior pulmonary vein by using his fingers.  (Def. 56.1 ¶ 14; Cargo Decl., Ex. F at 1; Camunas Tr. 46-47).  While placing his finger around the inferior pulmonary vein, Dr. Camunas caused the vein to tear, which resulted in severe bleeding.  (Def. 56.1 ¶ 14; Cargo Decl., Ex. F at 1; Camunas Tr. 47, 51, 59). The doctors attempted to control the bleeding, but were unsuccessful.  (Def. 56.1 ¶ 15).  Doctors administered fluids and performed CPR, but were unable to save Sullivan's life.  (Camunas Tr. 55-57; Cargo Decl., Ex. F at 1).  Sullivan died approximately 30 to 40 minutes later.  (Camunas Tr. 55; Cargo Decl., Ex. F at 1).

Following the surgery, Dr. Camunas and Dr. Madorin informed Plaintiff, who had come to the hospital after the surgery commenced, that Sullivan had died. (Camunas Tr. 40; Zeak Tr. 78). Dr. Camunas explained to Plaintiff that her father died "because of a vessel, pulmonary vein that tore as I was trying to get around that vein…." (Camunas Tr. 40). Dr. Camunas said he was "very sorry." (*Id.* at 41). Plaintiff responded to this news by telling Dr. Camunas that her father had not indicated that the surgery was "so risky." (*Id.* at 39). She asked Dr. Camunas for more details about her father's medical condition and about the surgical procedure. (*Id.* at 41-42). Several hours later, Dr. Camunas provided Plaintiff with a letter setting forth this information. (*See* Cargo Decl., Ex. F). Dr. Camunas also provided Plaintiff with information about how to submit a claim with the VA for survivor benefits. (*Id.* at 2; Zeak Tr. 85).

## B.   The Instant Litigation

Plaintiff initiated this action on June 22, 2011, alleging medical malpractice, negligent hiring and retention, and failure to obtain informed consent. (Complaint ("Compl.") ¶ 1). Plaintiffs served various entities and individuals, including the Government, in July 2011 (Dkt. #2), and the Government filed an Answer on September 6, 2011 (Dkt. #3).

Initially, Plaintiff included as Defendants the VA, the Bronx VA, Dr. Camunas, Dr. Madorin, and Dr. Loh (collectively, the "Other Defendants"). (Compl. ¶ 1). On September 16, 2011, the Honorable Deborah A. Batts, the District Judge to whom this case was then assigned, issued an Order to Show Cause why Plaintiff's action against the Other Defendants should not be

dismissed for failure to prosecute.  (Dkt. #4).  On November 1, 2011, after

Plaintiff failed to respond to the Order, the Honorable J. Paul Oetken, the

District Judge to whom this case had been reassigned, dismissed Plaintiff's

claims against the Other Defendants.  (Dkt. #6).

On November 10, 2011, Plaintiff moved to vacate the Order dismissing the

Other Defendants and requested an extension within which to file a motion for

default against the Other Defendants.  (Dkt. #7).  Judge Oetken granted this

application on the same day.  (*Id.*).  On November 18, 2011, Plaintiff filed an

Order to Show Cause why a default judgment should not be entered against the

Other Defendants.  (Dkt. #9).  On November 28, 2011, the Government filed a

response (Dkt. #10), in which it argued that, under the FTCA, the sole and

exclusive remedy for certain specified torts "arising or resulting from the

negligent or wrongful act or omission of any employee of the Government while

acting within the scope of his office or employment" is a suit against the United

States.  28 U.S.C. § 2679.  On February 23, 2012, Judge Oetken dismissed

Plaintiff's claims against the Other Defendants.  (Dkt. #17).  On June 24, 2013,

the action was reassigned to this Court.  (Dkt. #23).

## C.     The Expert Witnesses

The parties engaged in fact and expert discovery from November 16, 2012,

to December 13, 2013, culminating in the deposition of Plaintiff's expert, Dr.

Michael Zervos.  (*See* Dkt. #25, 29).  Because of the criticality of the expert

testimony to this motion, it is discussed in detail in the remainder of this

section.

1.      **Plaintiff's Expert Report**

Plaintiff's expert, Dr. Zervos, is a cardiothoracic surgeon and assistant professor of cardiothoracic surgery at New York University ("NYU") School of Medicine.  (Def. 56.1 ¶ 18).  In his expert report submitted in connection with this action, Dr. Zervos offered a number of opinions after having reviewed Sullivan's medical chart and the transcript of Dr. Camunas's deposition testimony.  (Cargo Decl., Ex. H at 1).  Dr. Zervos's first opinion was that the operative note (or "opnote") — a note prepared by the surgeons following the procedure — was deficient.  (*Id.*).  Dr. Zervos opined that the "opnote [wa]s … confusing and has several errors."  (*Id.*).  Dr. Zervos added that the operative note "was also dictated three days after the surgery by the resident."  (*Id.*).  In Dr. Zervos's estimation, "for a case like this, the operating surgeon should have dictated the note himself and made special notice to certain details of the procedure and the problems related to the surgery as a more experienced person than the resident."  (*Id.*).

The second opinion contained in Dr. Zervos's report concerns Dr. Camunas's decision to continue the surgical procedure despite the lack of visibility of the pulmonary veins.  (Cargo Decl., Ex. H at 1).  In this regard, Dr. Zervos stated:

> If I had a difficult time visualizing pulmonary veins, I would not attempt isolation without being able to see. There should have been a backup plan or a bailout type procedure…. If I got into the pericardium and could not get around the blood supply I would have tried an alternative procedure such as debriding as much infection and necrotic lung as possible and covering the rest with muscle, or used an [eloesser] flap [i.e., a

> surgically-created, skin-lined tract to promote drainage
> of pus from the area surrounding the lungs].

(*Id.*).

Dr. Zervos's third opinion was that he would have ordered several pre-operative tests that did not appear on Sullivan's chart. (Cargo Decl., Ex. H at 1). Specifically, Dr. Zervos noted that: (i) "the formal pulmonary function was not documented in the chart"; (ii) "I did not see a formal clearance from Cardiology and a stress test to ascertain whether or not a right pneumonectomy would have been possible"; and (iii) "I always obtain a Qualitative perfusion scan [i.e., a test to determine the amount of blood flowing to the lungs] prior to surgery to estimate the amount of perfusion that would be subtracted if the right lung would be removed." (*Id.*).

Dr. Zervos's fourth and final opinion was that, during the surgery, he would have taken additional precautions to ensure Sullivan's cardiovascular health. (*See* Cargo Decl., Ex. H at 1). Specifically, Dr. Zervos stated that he "would have definitely done this case in a heart room with a heart surgeon on standby and I do not think that the infection makes that impossible." (*Id.*). He offered similar views on the possibility of a bypass, observing, "I do not think cardiopulmonary bypass is contraindicated because of infection." (*Id.*).

### 2.    The Government's Expert Report

The Government's expert, Dr. Bernard K. Crawford, is a thoracic surgeon and director of general thoracic surgery at the Tisch Hospital NYU Langone Medical Center. (Def. 56.1 ¶ 21). The Government served Plaintiff with Dr. Crawford's expert report opining on the treatment and surgery after receiving

Dr. Zervos's report.  (*See* Cargo Decl., Ex. I).  Of note, Dr. Crawford opined that "[t]he operation itself was conducted in a standard fashion.…  The scarring around the pulmonary vein due to years of infection resulted in the tearing of the vessel during dissection and manipulation.  This is the expected difficulty in these cases."  (*Id.* at 2).

With respect to additional tests that could have been performed prior to surgery, Dr. Crawford opined that these were not necessary under the circumstances.  (Def. 56.1 ¶ 26; Cargo Decl., Ex. I at 2).  And with respect to the use of a heart-lung machine during Sullivan's surgery, Dr. Crawford submitted that this "technique … would result in uncontrollable bleeding when doing an extrapleural pneumonectomy," and, perhaps worse yet, "would not decrease the chance of injury to the pulmonary veins during the dissection."  (Cargo Decl., Ex. I at 2).  With respect to alternatives to pneumonectomy, Dr. Crawford observed that less aggressive procedures that did not remove all of the infected tissue "would leave this patient in the same position as when he entered the hospital, i.e. in danger of infecting his left lung and dying a septic death."  (*Id.* at 3).  Finally, Dr. Crawford opined that "[a]ppropriate consent was obtained clearly outlining the risk as well as benefits of the procedure."  (*Id.* at 2).

### 3.    Plaintiff's Expert Deposition Testimony

During his deposition, Dr. Zervos elaborated on, and in certain respects retreated from, the opinions contained in his expert report.  With respect to the first opinion regarding certain deficiencies with the operative note, Dr. Zervos

9

testified that his opinion as to who should dictate the note "is my opinion and my opinion alone." (Zervos Tr. 44). As to the potential three-day gap between when the surgery occurred and when the operative note was dictated, Dr. Zervos conceded that "[t]here are no guidelines for this…. I just feel that it is a better, safer approach to do that in that way." (*Id.* at 45).[2] Dr. Zervos reiterated that he found the note to be confusing, but clarified that the "errors" to which he referred in his expert report were typographical and not substantive. (*See id.* at 49, 54-55).

With respect to the second opinion, that Dr. Camunas should have implemented a backup or "bailout" procedure once he encountered difficulty seeing the pulmonary veins, Dr. Zervos testified — consistent with his report — that he would not have proceeded with the surgery in that eventuality, although he equivocated somewhat in his testimony. (*Compare* Zervos Tr. 67 ("[I]f I were unclear as to my ability to see and definitely perform what I had to do, I am *not so sure* that I would do that." (emphasis added)), *and id.* at 74 ("[I]f I'm in the operating room and I cannot achieve what I set out to achieve … which is removal of the lung, if I could not do that because I wouldn't visualize or for whatever reasons the lung was plastered to the blood vessels leading to the lung and I couldn't specifically visualize it and I couldn't see a way around that, I *might* just stop the surgery at that point and remove whatever loose

---

[2]     The record is not clear on when the dictation occurred. The operative note indicates an "entry date" of November 10, 2009. (Cargo Decl., Ex. D at 17). The operative note was signed by Dr. Madorin on November 13, 2009, and by Dr. Camunas on November 19, 2009. (*Id.* at 19). Dr. Zervos testified that he could not tell whether the operative note was dictated on November 10, the "entry date," or November 13, the date on which Dr. Madorin signed the operative note. (Zervos Tr. 42).

debris or loose necrotic tissue was in the chest, put some drains in and close the chest and call it a day." (emphasis added)), *with id.* at 68 ("All I am saying is that if I were not able to see I would not attempt."), *and id.* at 70 ("If I couldn't see what I was doing I wouldn't do that, yes.")).  Significantly, however, Dr. Zervos made clear that this opinion represented the approach *he* would have taken if confronted with the complication of not being able to visualize the pulmonary veins; he did not opine about what approach other doctors would (or should) have taken if faced with a similar challenge. (*See id.* at 78 ("I don't know what other surgeons would do ….  You may find ten other surgeons that say something different."); *id.* at 80 ("Now, that's just me.  I'm sure that you can find ten other guys that will tell you, I'm not leaving this operating room without having that lung out.")).

     With respect to his third opinion, regarding pre-operative testing, Dr. Zervos reiterated his preference to conduct additional tests.  (*See* Zervos Tr. 87 ("I just think that it is my preference, and this is what I do when I'm undertaking such a major operation, I want all the information that I can have in front of me beforehand…."); *id.* at 89 ("I just think that having had that documented beforehand would have been a nice thing.")).  Dr. Zervos added that,

> before one embarks on such a major operation, and I think that this is something that the majority of thoracic surgeons will do, they will look at detailed pulmonary function tests.  And at least in the hospitals I work at and the experience that I've had, all of the surgeons perform a qualitative perfusion scan as well ….

*Id.* at 88.  With respect to clearance from the Cardiology Department, Dr. Zervos testified that "you cannot go based on a clearance from 2009.  That's just not what's done."  (*Id.*).[3]  But while he testified that he would have ordered additional pre-operative tests prior to surgery, Dr. Zervos also testified that — given the condition of Sullivan's lung — the decision to perform the pneumonectomy was appropriate.  (*See id.* at 12, 14).  Further, he testified that the additional pre-operative tests would not have disclosed the specific complication that Dr. Camunas encountered in visualizing the pulmonary vein. (*See id.* at 97).

With respect to the fourth opinion, about the use of a heart-lung machine, cardiopulmonary bypass technology, or performing the surgery in a "heart room," Dr. Zervos testified that he was not sure he actually would have utilized these precautions.  (Zervos Tr. 101 ("I'm not saying that the heart-lung machine should have been something that I would have done beforehand or that I would have prepared for that."); *id.* at 102 ("Q: You are saying if you had been the surgeon, you would have done it in a heart room or you don't know? You would have to know more information?  A: That's a little speculative. That's sort of like Monday morning quarterbacking a little bit.")).

During his deposition, there were several topics on which Dr. Zervos explicitly disclaimed an expert opinion.  Of particular significance to the instant motion, Dr. Zervos testified that he could not define the standard of

---

[3]     During the deposition, Dr. Zervos testified that he believed that clearance from the Cardiology Department had been obtained two years prior to the surgery.  (Zervos Tr. 8). When reminded that clearance from the Cardiology Department had been obtained in early 2009 (less than a year prior to surgery), Dr. Zervos indicated that relying on such clearance would have been "more acceptable."  (*Id.* at 99).

care owed Sullivan under these circumstances.  (*See* Zervos Tr. 37 ("I don't like that terminology because I don't think that in medicine we have standards of care.  I don't think that there is a book that says this is the standard of care for this.")).  He further testified that he would not opine on whether Dr. Camunas departed from the relevant standard of care in his treatment of Sullivan.  (*See id.* at 77 ("Again, I'm not going to comment on this.  I'm not going to offer an opinion to what is something — a perceived standard of care to something that somebody did to a standard of care — I'm just not going to do that.")).  Finally, after reading through the expert report prepared by the Government's witness — Dr. Crawford — Dr. Zervos added,

> I feel different on a lot of these issues and I think that you can take multiple other physicians and you would get multiple other opinions.…  I'm just saying you have another thoracic surgeon here who says that everything was done appropriately; that I think you can get ten other thoracic surgeons and you might get ten other opinions.

(*Id.* at 103-04).  Finally, Dr. Zervos expressed no expert opinion on whether the doctors acted appropriately after the tear in Sullivan's pulmonary vein occurred, when they attempted to stop the bleeding and save Sullivan's life (*id.* at 105), or whether the doctors obtained Sullivan's informed consent prior to the surgery (*id.* at 72).

### 4.    The Instant Motion

On December 31, 2013, shortly after the deposition of Dr. Zervos, the Government informed the Court of its intention to file a motion for summary judgment.  (Dkt. #31).  On January 27, 2014, the Court held a conference to

discuss the Government's anticipated motion.  (Dkt. #40).  The Government's motion for summary judgment was filed on March 10, 2014 (Dkt. #35); Plaintiff's opposition was filed on May 9, 2014 (Dkt. #48); and the motion was fully briefed as of the filing of the Government's reply on May 23, 2014 (Dkt. #50).  The Court now considers the Government's motion.

## DISCUSSION

### A.    Applicable Law

Under Fed. R. Civ. P. 56(a), summary judgment may be granted only if all the submissions taken together "show[] that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment

appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings. *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal quotation marks omitted), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986). Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citations omitted).

## B.     Plaintiff's Medical Malpractice Claims Fail

### 1.     Evaluation of Medical Malpractice Claims at the Summary Judgment Stage

"The FTCA makes the United States liable for certain tort claims, including medical malpractice, committed by federal employees as determined by state law."  *Lettman* v. *United States*, No. 12 Civ. 6696 (LGS), 2013 WL 4618301, at *3 (S.D.N.Y. Aug. 29, 2013); *see generally Phillips* v. *Generations*

*Family Health Center*, 723 F.3d 144, 147, 150 (2d Cir. 2013).  FTCA claims are analyzed "in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b).  Accordingly, as the surgery took place in New York, this Court will apply New York law to Plaintiff's claims.

Although New York law governs the substantive claims, federal law governs the burdens that the parties must meet at the summary judgment stage.  *See Tingling* v. *Great Atl. & Pac. Tea Co.*, No. 02 Civ. 4196 (NRB), 2003 WL 22973452, at *2 (S.D.N.Y. Dec. 17, 2003) ("The issue of what burden a movant for summary judgment bears when the ultimate burden of proof lies with the non-movant is procedural rather than substantive … and accordingly is subject to federal rather than state law."); *see also Hughes* v. *United States*, No. 12 Civ. 5109 (CM), 2014 WL 929837, at *4 (S.D.N.Y. Mar. 7, 2014) ("Even though the substantive claims are governed under New York law, the procedural issues are determined under the federal standard."); *Doona* v. *OneSource Holdings, Inc.*, 680 F. Supp. 2d 394, 396 (E.D.N.Y. 2010) ("[T]he respective burdens that the parties bear in a summary judgment motion are procedural rather than substantive, and are thus subject to federal rather than state law."). Accordingly, because federal law governs the parties' respective burdens on summary judgment, the Government may "satisfy its burden for summary judgment under [Fed. R. Civ. P. 56(a)] by pointing to an absence of evidence to support an essential element of the nonmoving party's claim."  *Shimunov* v. *Home Depot U.S.A, Inc.*, No. 11 Civ. 5136 (KAM), 2014 WL 1311561, at *3 (E.D.N.Y. Mar. 28, 2014) (internal quotation marks and citation omitted).

To prevail on a medical malpractice claim under New York law, a plaintiff must demonstrate "[i] that the defendant breached the standard of care in the community, and [ii] that the breach proximately caused the plaintiff's injuries." *Arkin* v. *Gittleson*, 32 F.3d 658, 664 (2d Cir. 1994); *accord Hytko* v. *Hennessey*, 879 N.Y.S.2d 595, 598 (3d Dep't 2009). Furthermore, "it is well established in New York law that unless the alleged act of malpractice falls within the competence of a lay jury to evaluate, it is incumbent upon the plaintiff to present expert testimony in support of the allegations to establish a prima facie case of malpractice." *Sitts* v. *United States*, 811 F.3d 736, 739 (2d Cir. 1987) (internal quotation marks and citation omitted). Plaintiffs are only excused from providing expert testimony in medical malpractice cases where "a deviation from a proper standard of care [is] so clear and obvious that it will be within the understanding of the ordinary layman without the need for expert testimony." *Id.* at 740. For example, in cases "where a dentist has pulled the wrong tooth, or where an unexplained injury has occurred to a part of the body remote from the site of the surgery, expert testimony is not needed for the establishment of the plaintiff's prima facie case." *Id.* (internal citations omitted).

### 2. Plaintiff's Failure to Provide Expert Testimony Concerning Both the Appropriate Standard of Care and Its Breach Is Fatal to Her Medical Malpractice Claims

The Government argues it is entitled to summary judgment because the Plaintiff failed to provide expert testimony that Dr. Camunas breached the relevant standard of care, or that any such breach proximately caused Sullivan's injury and death. (Def. Br. 23-25; Def. Reply 3-4). The Court agrees,

finding that Dr. Zervos's expert report and testimony fail to provide the evidence needed for Plaintiff to make out a prima facie case of medical malpractice under any theory.

During his deposition, Dr. Zervos repeatedly disclaimed the ability to define the standard of care. Plaintiff cannot overcome this deficiency. "Under New York law, a plaintiff in a medical malpractice action must produce medical testimony to establish the proper standard of care." *Hegger* v. *Green*, 646 F.2d 22, 29 (2d Cir. 1981); *see also Perricone-Bernovich* v. *Gentle Dental*, 875 N.Y.S.2d 169, 171 (2d Dep't 2009) (finding defendant was entitled to judgment as a matter of law where "plaintiffs' expert specifically stated that he did not form an opinion as to whether the defendant departed from any standard of care and, in fact, was 'not quite sure' what the standard of care was"); *Sohn* v. *Sand*, 580 N.Y.S.2d 458, 459 (2d Dep't 1992) (finding defendant was entitled to judgment as a matter of law where plaintiff's expert "did not expressly state that the defendant's conduct constituted a deviation from the requisite standard of care"). Here, unable or unwilling to opine on the appropriate standard of care, Dr. Zervos was, *a fortiori*, unable or unwilling to opine on whether Dr. Camunas breached this standard of care. (*See* Zervos Tr. 77 (refusing to compare "something that somebody did to a standard of care")). What is more, for only one of his four opinions — his opinion that Dr. Camunas should have stopped the surgery and performed a "bailout" procedure — did Dr. Zervos even attempt to establish any causal link between Dr. Camunas's decisions or actions and the patient's injury and death. "To defeat Defendants' Rule 56 motion, Plaintiff

must — but did not — submit expert medical opinion supporting her theory of causation." *Kennedy* v. *N.Y. Presbyterian Hosp.*, No. 09 Civ. 6256 (RMB), 2011 WL 2847839, at *4 (S.D.N.Y. July 6, 2011).

Plaintiff argues that Dr. Zervos's expert testimony supports a prima facie case of malpractice, noting that "New York law does not require that an expert use any particular phrases or magic words in offering an opinion." (Pl. Opp. 12). *See also Knutson* v. *Sand*, 725 N.Y.S.2d 350, 354-55 (2d Dep't 2001) ("A court's duty … is not to reject opinion evidence because non-lawyer witnesses … fail to use the words and phrases preferred by lawyers and judges, but rather to determine whether the whole record exhibits substantial evidence that there was a departure from the requisite standard of care."). While the Court agrees that Plaintiff's expert was not required to use specific terms of art in his expert report or deposition testimony, the Court disagrees that, taken as a whole, the record contains evidence that there was a departure from the relevant standard of care.

With respect to his first opinion — that the operative note was confusing, and that it was dictated by a resident three days after the surgery — Dr. Zervos acknowledged that there were "no guidelines for this." (Zervos Tr. 45). In consequence, Plaintiff can provide no evidence that the manner in which Dr. Camunas and his colleagues maintained or created the operative note deviated from the relevant standard of care. Furthermore, even if the preparation of the operative note had deviated from the standard of care, Dr. Zervos did not testify

as to any causal link between the operative note and Sullivan's death, as would be required for Plaintiff to set forth a prima facie case for malpractice.

With respect to Dr. Zervos's second opinion — that Dr. Camunas should have attempted a "bailout" procedure after encountering difficulties in visualizing the pulmonary vein — Dr. Zervos testified that, "I don't know what other surgeons would do.  All I can say is what I would do under the given circumstance ….  You may find ten other surgeons that say something different." (Zervos Tr. 78).  Accordingly, Plaintiff has failed to provide evidence that Dr. Camunas's decision to continue with the pneumonectomy deviated from the standard of care.[4]

Dr. Zervos's third opinion — that several pre-operative tests should have been ordered — comes the closest among all of his opinions to establishing a breach of a standard of care.  Dr. Zervos testified that "*the majority* of thoracic surgeons … will look at detailed pulmonary function tests," and "*all of the surgeons* perform a qualitative perfusion scan as well …." (Zervos Tr. 88 (emphasis added)).  With respect to clearance from the Cardiology Department, Dr. Zervos testified that "you cannot go based on a clearance from 2009.  *That's just not what's done*." (*Id.* (emphasis added)).  This testimony suggests Dr. Zervos believed that Dr. Camunas breached the standard of care by not ordering at least some of these additional pre-operative tests.  As noted above,

---

[4]    Conversely, the Government's expert, Dr. Crawford — who also reviewed Sullivan's chart and Dr. Camunas's deposition transcript — stated that the operation proceeded in "a standard fashion," and that the "tearing of the pulmonary vein during dissection and manipulation" was among the "expected intraoperative hazard[s]." (Cargo Decl., Ex. I at 2).

Dr. Zervos's opinion was factually incorrect, inasmuch as it was predicated in part on the mistaken belief that clearance from the Cardiology Department had been obtained two years prior to the surgery, when it had in fact been obtained less than one year prior. (*See id.* at 98-99). More pointedly, however, Plaintiff failed to establish through expert testimony any causal link between the failure to order these pre-operative tests and Sullivan's injury and death. Dr. Zervos certainly did not testify that any of these tests would have predicted the complication that Dr. Camunas faced in accessing the pulmonary vein or would have prevented the tear of the pulmonary vein from occurring. (*Id.* at 97). *Cf. Estiverne* v. *Esernio-Jenssen*, 833 F. Supp. 2d 356, 381-82 (E.D.N.Y. 2011) (denying summary judgment where plaintiff's expert testified that defendants failed to order additional testing that would have led to a diagnosis of plaintiff's injury). Indeed, Plaintiff has provided no expert testimony that results from these pre-operative tests would have affected the decision to go ahead with the surgery in any material respect. (*See id.* at 14 ("As far as I could tell, the surgery was indicated, based on the reports.")).

As to the fourth opinion in Plaintiff's expert report — that the surgery should have been performed in a "heart room" or with the use of a heart-lung or cardiopulmonary bypass machine — Dr. Zervos testimony again falls short of establishing that any extra precautions with respect to Sullivan's cardiovascular health should have been taken. When asked about this particular opinion during his deposition, Dr. Zervos testified that, "I'm not saying that the heart-lung machine should have been something that I would have done beforehand

or that I would have prepared for that." (Zervos Tr. 101).  This testimony fails to establish that Dr. Camunas breached the requisite standard of care in not taking the additional cardiovascular precautions Dr. Zervos identified in his expert report.[5]

In short, Plaintiff has failed to make out a prima facie case of medical malpractice and the Government is entitled to summary judgment on this basis. "If a plaintiff cannot establish a prima facie case without the benefit of expert testimony, and the plaintiff is unable to procure such testimony, then summary judgment is appropriate." *Adorno* v. *Corr. Servs. Corp.*, 312 F. Supp. 2d 505, 514 (S.D.N.Y. 2004) (citing *Grassel* v. *Albany Med. Ctr. Hosp.*, 636 N.Y.S.2d 154, 155 (3d Dep't 1996)).

### 3. No Genuine Issues of Material Fact Remain as to Plaintiff's Medical Malpractice Claims

Plaintiff argues that numerous genuine issue of material fact remain, precluding summary judgment in favor of the Government.  The Court disagrees, and shall address each of Plaintiff's arguments in turn.

First, Plaintiff argues that "issues of fact remain as to whether attempting to isolate the pulmonary vein without being able to see was good and acceptable medical practice." (Pl. Opp. 12).  Plaintiff, however, has provided no expert testimony that attempting to isolate the pulmonary vein without seeing it constituted a breach of the standard of care; instead, Plaintiff's expert testified

---

[5]     Additionally, Dr. Crawford disagrees that these cardiovascular precautions should have been taken, and opines, without contravention from Plaintiff, that utilizing one of the proposed techniques "would result in uncontrollable bleeding when doing an extrapleural pneumonectomy."  (Cargo Decl., Ex. I at 2).

that it was not a technique he would choose to employ, but also noted several times that other surgeons might.  (*See* Zervos Tr. 78-80).  Furthermore, the Government's expert witness opined that the procedure "was conducted in the standard fashion."  (Cargo Decl., Ex. I at 2).

Plaintiff argues that issues of fact remain as to whether the doctors adequately controlled the bleeding after the tear occurred.  (Pl. Opp. 13-14).  But Plaintiff has adduced no evidence whatsoever that the doctors failed to act appropriately following the tearing of the pulmonary vein.  Plaintiff's expert specifically noted that he did not intend to offer any opinion as to the doctors' response following the tear.  (Zervos Tr. 105-06).

Somewhat cryptically, Plaintiff argues that several issues of fact remain as to "whether the operation occurred as Dr. Camunas claimed."  (Pl. Opp. 16).  Plaintiff suggests, for instance, that Dr. Madorin — the resident who assisted with the surgery — was actually the lead surgeon.  (*Id.* at 17).  In support of this allegation, Plaintiff argues that (i) the operative note was dictated by Dr. Madorin; (ii) Dr. Madorin is listed on the operative note as the "surgeon";[6] Dr. Madorin used the first-person plural — "we" — when describing the procedure in the operative note; and (iv) Dr. Loh testified that Dr. Madorin assisted during the dissection of the lung.  (*Id.*).  Plaintiff also points to Dr. Zervos's comment during deposition that the operative note "reads as if the resident … performed the surgery."  (Zervos Tr. 47).  That Dr. Madorin was the lead surgeon during the procedure is pure speculation, and not a genuine issue

---

[6]      It bears noting that Dr. Camunas is listed on the operative note as the "attending surgeon."  (Cargo Decl., Ex. D at 17).

of material fact.  *See Rosales* v. *Fischer*, No. 07 Civ. 10554 (LAP), 2011 WL 253392, at *8 (S.D.N.Y. Jan. 24, 2011) ("[S]uch speculation is insufficient to create a genuine issue of material fact as to [defendant's] involvement in the alleged assaults.").  Plaintiff did not depose Dr. Madorin, but she did depose the other two surgeons who participated, Dr. Camunas and Dr. Loh.  Dr. Camunas testified that he was the lead surgeon, and that Dr. Madorin assisted him, primarily by providing exposure to the operating area.  (Camunas Tr. 48-49). Dr. Loh's testimony is completely consistent with this account.  (Loh Tr. 30 ("He [Dr. Camunas] was doing the surgery and she [Dr. Madorin] was providing exposure.")).  Even Plaintiff's expert testified that "Dr. Camunas was the main operating surge[on]; the resident was the resident surgeon; and then Dr. Loh was the second assistant surgeon." (Zervos Tr. 107).  Accordingly, there is no factual dispute as to who performed the surgery.

Plaintiff also argues that issues of fact remain as to what degree of visibility Dr. Camunas had of the pulmonary vein.  (Pl. Opp. 16).  Plaintiff points to an alleged discrepancy between Dr. Camunas's testimony (which indicated that he found the vein by touch alone) and the operative note (which indicated that Dr. Camunas could see the vein "intermittently").  (*Id.*).  Even assuming this factual issue remains, it is not material because Dr. Zervos, who had an opportunity to review Dr. Camunas's testimony and the operative note before testifying, made clear the basis for his testimony: "My understanding was [the doctors] *weren't able to see*, but despite that [the doctors] actually attempted something.  All I am saying is that *if I were not able to see* I would not attempt."

(Zervos Tr. 68 (emphases added)).  Dr. Zervos's testimony that he would have stopped the surgery is predicated on the understanding that Dr. Camunas had no visibility of the veins.  Nonetheless, Dr. Zervos declined to offer an opinion that Dr. Camunas's actions in continuing the surgery constituted a breach of the standard of care.  The only conceivable factual dispute that remains is whether Dr. Camunas had *more* visibility of the veins than Dr. Zervos believed when he provided his expert testimony.  Resolution of this factual dispute in Plaintiff's favor — that is, establishing as a fact that Dr. Camunas proceeded with the surgery with no visibility — will leave Plaintiff exactly where she currently stands, with expert testimony insufficient to support a prima facie case of malpractice.  Accordingly, this factual dispute is immaterial and does not preclude summary judgment.  *See Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

Plaintiff further argues that a discrepancy in the testimonies of Dr. Camunas and Dr. Loh creates an issue of fact remains as to whether Dr. Camunas tore the pulmonary vein with an instrument or with his finger. (Pl. Opp. 16; *compare* Camunas Tr. 50-51, *and* Cargo Decl., Ex. D at 18, *with* Loh Tr. 37-38).  But Plaintiff overstates this discrepancy and its import.  During Dr. Loh's testimony, he stated that Dr. Camunas "was trying to go around the pulmonary vein" with "very fine right angle instruments."  (Loh Tr. 37-38).  But Dr. Loh also testified that he did not know how the vein was torn and that he could not see the tear.  (*Id.* at 38).  Again, even assuming that this factual issue

remains, it is immaterial because Plaintiff has failed to present expert testimony indicating that the use of an instrument near the pulmonary vein would constitute a breach of the standard of care.

Additionally, Plaintiff argues that issues of fact remain as to whether pre-operative testing was sufficient.  (Pl. Opp. 18).  However, as with the other outstanding factual issues Plaintiff asserts, the allegation of inadequate pre-operative testing has not been established with expert testimony showing that a breach of the standard of care occurred.

Finally, Plaintiff argues that summary judgment in favor of the Government is not warranted because factual issues remain as to whether the doctors obtained Sullivan's informed consent to the surgical procedure.  (Compl. ¶¶ 95-106; Pl. Opp. 18-21).  Where, as here, it is alleged that a medical provider failed to advise the patient of the "reasonably foreseeable risks and benefits of, and alternatives to, the treatment proposed and rendered" (Compl. ¶ 96), a lack of informed consent claim is simply "a species of a medical malpractice negligence claim," *Soriano* v. *United States*, No. 12 Civ. 4752 (VB), 2013 WL 3316132 (S.D.N.Y. July 1, 2013) (citing *Messina* v. *Matarasso*, 729 N.Y.S.2d 4, 7 (1st Dep't 2001)).  "To succeed in a medical malpractice cause of action premised on lack of informed consent, a plaintiff must demonstrate that [i] the practitioner failed to disclose the risks, benefits and alternatives to the procedure or treatment that a reasonable practitioner would have disclosed and [ii] a reasonable person in the plaintiff's position, fully informed, would have elected not to undergo the procedure or treatment." *Orphan* v. *Pilnik,* 15 N.Y.3d

907, 908 (N.Y. 2010).  As the Government correctly points out (*see* Def. Reply 9), this variety of medical malpractice claim must also be supported by expert testimony.  *See Orphan*, 15 N.Y.3d at 908 ("Expert medical testimony is required to prove the insufficiency of the information disclosed to the plaintiff."); *Gardner* v. *Wider*, 821 N.Y.S.2d 74, 76 (1st Dep't 2006) ("[A] plaintiff's claim for medical malpractice based on lack of informed consent must be dismissed if the plaintiff fails to adduce expert testimony establishing that the information disclosed to the patient about the risks inherent in the procedure is qualitatively inadequate.").  Dr. Zervos's expert report contained no opinion as to the adequacy of the information disclosed to Sullivan and he made clear during his deposition that he did not intend to offer any opinion on this issue. (Zervos Tr. 72).

Although the Court is sympathetic to the loss Plaintiff has suffered, the Court also recognizes that the law is clear that medical malpractice claims must be supported by expert testimony.  Plaintiff's inability to produce expert testimony to support a prima facie case of medical malpractice is fatal to those claims.

## CONCLUSION

For the reasons discussed herein, the Government's motion for summary judgment is GRANTED.  The Clerk of Court is directed to terminate Docket Entry 35.

Because the Government has not moved for summary judgment on Plaintiff's claims of negligent hiring and retention, these claims have not be

addressed.  The parties are hereby directed to appear for a conference on

November 10, 2014, at 3:00 p.m. in Courtroom 618 of the Thurgood Marshall

Courthouse, 40 Foley Square, New York, New York to discuss Plaintiff's

remaining claims.

       SO ORDERED.

Dated: October 20, 2014
       New York, New York

                                       KATHERINE POLK FAILLA
                                United States District Judge